UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

RUSAVIAINVEST, OOO,

                        Plaintiff,

        v.

JANET YELLEN, in her official capacity as
The Secretary of the Treasury, ANDREA M.
GACKI, in her official capacity as the
Director of the Office of Foreign Assets
Control, MERRICK B. GARLAND, in his
official capacity as the Attorney General of
the United States, and UNITED STATES
DEPARTMENT OF THE TREASURY,
OFFICE OF FOREIGN ASSETS
CONTROL,

                        Defendants.

**ORDER**

18 Civ. 5676 (PGG)

---------------------------------------------------------------

PAUL G. GARDEPHE, U.S.D.J.:

        In this action brought under the Administrative Procedure Act ("APA"), Plaintiff Rusaviainvest, OOO challenges a decision by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") to block three wire transfers worth $1.4 million because a person or entity sanctioned under Executive Order 13,224 had an interest in the funds.[1] (Cmplt. (Dkt. No. 3) ¶¶ 1, 19-21, 31)

---

[1] Executive Order 13,224 "authorize[s] the Treasury Department to designate a person[] as a Specifically Designated Global Terrorist ('SDGT') if the Treasury finds that the person is 'owned or controlled by' a designated terrorist group; assists in, sponsors, or provides material or financial support to a terrorist group; or is 'otherwise associated with' a terrorist group." Doe v. JPMorgan Chase Bank, N.A., 899 F.3d 152, 154 (2d Cir. 2018) (quoting Executive Order 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) § 1(c)-(d)). "Persons and organizations designated as . . . SDGTs are included in [OFAC's] Specially Designated Nationals and Blocked Persons List ('SDN List')." O'Sullivan v. Deutsche Bank AG, 2019 WL 1409446, at *2 n.3 (S.D.N.Y. Mar. 28, 2019). The SDN list includes "individuals and companies owned or controlled by . . . targeted countries" and "individuals, groups, and entities, such as terrorists . . . designated under

Rusaviainvest seeks (1) a declaratory judgment that OFAC's decision was arbitrary, capricious, and an abuse of discretion and (2) injunctive relief to unblock the funds. (Id. at 13)[2] The parties have cross-moved for summary judgment. (Dkt. Nos. 57, 60) For the reasons stated below, Defendants' motion will be granted, and Rusaviainvest's motion will be denied.

## BACKGROUND

I.   FACTS[3]

   A.   **Rusaviainvest's Contract with Uzbekistan Airways and the Blocked Wire Transfers**

Rusaviainvest is a Moscow-based company that is engaged in the wholesale trading of transportation vehicles, including airplane parts and engines. (Certified Administrative Record ("CAR") (Dkt. No. 40-4) at 14-16) The company is wholly owned by Andrey Vorobev, who serves as its chief executive officer. (Id.)

According to the Complaint and documents attached to the Complaint, on October 27, 2016, Plaintiff Rusaviainvest entered into an agreement to purchase a certain used aircraft

---

[sanctions] programs that are not country-specific." Specially Designated Nationals And Blocked Persons List (SDN) Human Readable Lists, U.S. DEPT. OF TREASURY, www.treasury.gov/resource-center/sanctions/sdn-list/pages/default.aspx. The assets of parties appearing on the SDN list "are blocked and U.S. persons are generally prohibited from dealing with them." Id.

[2] Citations to page numbers refer to the pagination generated by this Court's Electronic Case Files ("ECF") system.

[3] "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997); see also Aleutian Cap. Partners, LLC v. Hugler, 2017 WL 4358767, at *5 (S.D.N.Y. Sept. 28, 2017) ("[T]he reviewing court may only review evidence produced in the administrative record."). Accordingly, the facts set forth herein are drawn from the Certified Administrative Record ("CAR"). As discussed below, much of the CAR is classified. Accordingly, the public version of the CAR (Dkt. No. 40) has been redacted and the classified version has been filed ex parte for in camera review by the Court. (Rasmussen Decl. (Dkt. No. 40-1) ¶ 4)

2

from Uzbekistan Airways. Plaintiff agreed to purchase of an Airbus "A-310 MSN 706" aircraft in exchange for $2 million, with payment to be made within 10 business days of Plaintiff's inspection of the aircraft and in U.S. dollars. (See Cmplt., Ex. A (Dkt. No. 3-1) at 1, 3, 5-6; CAR (Dkt. No. 40-4) at 20, 22, 25) Plaintiff has also submitted an invoice from Uzbekistan Airways to Plaintiff confirming that the subject of the purchase agreement is "One Airbus Model A310 [], Reg. no. UK 31003, MSN 706" which is equipped with "two Pratt & Whitney model PW4152 engines MSN P724942 and P724943 and GTCP 331-250 APU P-1318" and that the purchase price is $2 million USD. (Cmplt., Ex. B (Dkt. No. 3-2); CAR (Dkt. No. 40-4) at 51)

Rusaviainvest states that, after purchasing this used Airbus, it intended to sell the aircraft's parts. (CAR (Dkt. No. 40-4) at 14)

As payment towards the purchase price of the Airbus Model A310 aircraft, Rusaviainvest initiated wire transfers of $200,000 and $1 million on March 30, 2017 and March 31, 2017, respectively, to the bank account of Uzbekistan Airways. (Id. at 16)

Rusaviainvest's bank, Absolut Bank, later informed Rusaviainvest that an intermediary bank – JP Morgan Chase Bank, N.A. – had blocked the wire transfers "as per OFAC" "under the global terrorism sanctions regulations." (Id. at 8-9, 16, 67, 69 (capitalization altered))

On April 10, 2017, Rusaviainvest initiated another wire transfer of $200,000 to Uzbekistan Airways, but Absolut Bank later communicated to Rusaviainvest that the intermediary bank for this transfer – Deutsche Bank Trust Company Americas – had blocked the transaction "under regulations issued by the US Office of Foreign Assets Control (OFAC)."[4] (Id.

---

[4] The record does not disclose when Plaintiff was first notified that its wire transfers were blocked.

3

at 16, 77 (capitalization altered)) Absolut Bank informed Rusaviainvest that it was "prohibited from returning blocked funds until such time as OFAC issues a license permitting release of these funds." (See id. at 16 (capitalization altered))

  B. **Rusaviainvest's Applications to Unblock the Wired Funds**

Vorobev applied to OFAC for licenses to unblock the $1.4 million associated with Rusaviainvest's three wire transfers on the following dates. Vorobev filed two such applications to OFAC dated April 24, 2017 (CAR (Dkt. No. 40-4) at 4-12; id. (Dkt. No. 40-5) at 4-12), as well as applications dated April 26, 2017 (id. (Dkt. No. 40-5) at 13-21), May 4, 2017 (id. (Dkt. No. 40-6) at 4-31), May 15, 2017 (id. (Dkt. No. 40-5) at 22-55), and May 19, 2017. (Id. (Dkt. No. 40-5) at 56-76).[5] Rusaviainvest then retained counsel – Eric M. Creizman – to assist in obtaining the necessary licenses.

On June 6, 2017, Creizman submitted a letter to OFAC's Licensing Division supplementing Rusaviainvest's applications. (CAR (Dkt. No. 40) at 13-17) In Creizman's June 6, 2017 letter, he describes the purpose of Rusaviainvest's transaction with Uzbekistan Airways and the nature of its business, and notes that Rusaviainvest "should not be confused with a company with a similar name, 'Rusavia, Ltd.' whose website is en.rusavia.com, which according to the website, deals in a 'Russian-American project' titled 'Warplanes to Syria.'" (Id. at 14, 16) According to Creizman, Rusaviainvest "does not deal in weapons, arms, or military equipment and does not do business with any [c]ountry's military or any military organization." (Id.) The letter further states that Rusaviainvest "has absolutely nothing to do with any terrorist

---

[5] The CAR indicates that the license applications filed on April 26, May 15, and May 19, 2017, were "closed" for being duplicative of existing applications or "merged" with existing case files, leaving three separate license applications (two filed on April 24, 2017, and a third filed on May 4, 2017). (Id.)

4

organization," and that Vorobev is neither "affiliated with any" Specially Designated National ("SDN"), nor "does he do business with any SDNs." (Id. at 17; see supra n.1) Creizman further represents that "[n]one of [Plaintiff's] employees is an SDN." (Id. (Dkt. No. 40-4) at 17)

After receiving no response, on July 5, 2017, Creizman sent a letter to OFAC's Chief of Blocked Assets Administration and Analysis, reiterating the information set forth in his June 6, 2017 letter. (Id. at 85-88)

On August 21, 2017, Creizman sent a letter to OFAC's Compliance Department, stating the following:

> I have tried on a weekly basis for several months now to actually communicate with a live human being. . . . Although I have emailed, wrote, and called OFAC, I still have not been able to speak to a live human being, nor have I been contacted by one. My client is not a wealthy company. It is an honest business and its funds were blocked in an attempted transaction to purchase a used airplane from the Uzbekistan national air carrier.

(Id. at 175-76)

On October 3, 2017, Creizman emailed OFAC stating that "[a]ccording to the licensing hotline, this matter wa[s] closed and a letter for closure was mailed out on or about August 20, 2017. I have not received it." (Id. at 192)

### C. OFAC's Denial of Rusaviainvest's Applications to Unblock the Funds

On October 5, 2017, Mary Patricia Rasmussen, Chief of OFAC's Licensing Division, issued three identical letters (one for each application) to Rusaviainvest denying its license applications and requests to unblock the funds. In these letters, Rasmussen provides the following explanation:

> As reflected by your application or by information otherwise available to OFAC, the blocked funds transfer in question involves an interest of a person sanctioned pursuant to Executive Order 13224. It is OFAC's policy to license the release of blocked property only in limited circumstances, most of which do not involve

5

> commercial activity. Upon review, OFAC has determined that this blocked funds transfer does not fall within those limited circumstances. Accordingly, licensing the release of the blocked funds would be inconsistent with OFAC policy, and your request is denied. You may request reconsideration of this decision and provide additional information as described on OFAC's website . . . .

(Id. (Dkt. No. 40-4) at 195-96; id. (Dkt. No. 40-5) at 266-67; id. (Dkt. No. 40-6) at 229-30)

On November 28, 2017, Rusaviainvest submitted applications for reconsideration to OFAC. (Reconsideration Application (Dkt. No. 3-18)) The reconsideration applications include an affidavit from Vorobev stating that Rusaviainvest "has never had any relations with any person or organization specified under the Executive order." (Vorobev Aff. (Dkt. No. 3-19)) Vorobev also says that "'Uzbekistan Airways' has long-standing cooperation with Boeing company." (Id.)

In a January 25, 2018 letter, Creizman followed up on Rusaviainvest's reconsideration applications:

> We have no understanding as to why the funds were blocked. . . . I have not been able to speak to a single human being from OFAC – no lawyer, regulator, or anyone – and I have tried very hard to engage in a dialogue, so I can explain to my client why it is not getting its funds back. I would appreciate a meeting or a call so that we can address OFAC's concerns. . . .

(Jan. 25, 2018 Ltr. (Dkt. No. 3-20)) OFAC did not respond to Creizman's letter. (Cmplt. (Dkt. No. 3) ¶ 35; Answer (Dkt. No. 27) ¶ 35) To the Court's knowledge, the reconsideration applications remain pending.[6]

---

[6] Rusaviainvest's reconsideration applications are attached as an exhibit to the Complaint. (See Dkt. No. 3-18) Because (1) Rusaviainvest's reconsideration applications remain pending; and (2) the APA only permits review of "final agency action," the reconsideration applications are not part of the administrative record. (Def. Br. (Dkt. No. 38) at 14-15 n.5 (citing 5 U.S.C. § 704))

6

## II. PROCEDURAL HISTORY

This action was commenced on June 22, 2018. (Dkt. No. 1) The Complaint seeks a declaratory judgment that OFAC's refusal to unblock the funds violates the APA, because the decision is "arbitrary, capricious, an[d] [an] abuse of discretion" and because OFAC has acted "in excess of its statutory authority"; and (2) injunctive relief unblocking the funds. (Cmplt. (Dkt. No. 3) ¶¶ 40-45)

The parties initially cross-moved for summary judgment in 2019. (Dkt. Nos. 37, 45) On May 27, 2020, this Court denied the parties' motions without prejudice to renewal because the parties' dispute turns on classified information, and, as a result of the COVID-19 pandemic, it was not possible for the Court to review the classified material in the courthouse, which was then closed. (Dkt. No. 52) The parties' renewed cross-motions for summary judgment were filed in January 2023. (Dkt. Nos. 57, 60)

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Summary Judgment Standard in APA Cases

Summary judgment is appropriate under Rule 56 when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving review of a final agency action under the APA, however, "the usual Rule 56 summary judgment standard 'does not apply,'" New York v. United States Dep't of Health & Hum. Servs., 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (quoting Ass'n of Proprietary Colleges v. Duncan, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015)), because "'the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" Koopmann v. United States Dep't of

7

Transportation, 335 F. Supp. 3d 556, 560 (S.D.N.Y. 2018) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). District courts presiding in such cases must decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Coal. for Common Sense in Gov't Procurement v. United States, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). It is the role of the administrative agency to "resolve factual issues" and "to arrive at a decision that is supported by the administrative record," and it is the role of the district court "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Baiju v. U.S. Dep't of Lab., 2014 WL 349295, at *8 (E.D.N.Y. Jan. 31, 2014)

### B. Standard of Review Under the APA

Under the APA, "courts review agency actions under a deferential standard, under which such actions may only be disturbed if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.'" Noroozi v. Napolitano, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting 5 U.S.C. § 706(2)(A), (E)); see also Int'l Internship Programs v. Napolitano, 853 F. Supp. 2d 86, 96 (D.D.C. 2012) ("Review of final agency action under the APA is highly deferential.").

"An agency [action] may be deemed arbitrary, capricious or an abuse of discretion 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Henley v. Food & Drug Admin., 77 F.3d 616, 620 (2d Cir. 1996) (quoting Motor Vehicle Mfrs. Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "In other words, so long

as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." Karpova v. Snow, 497 F.3d 262, 268 (2d Cir. 2007).

"The Court's task is not to engage in an independent evaluation of the cold record, nor to substitute its judgment for that of the agency." Noroozi, 905 F. Supp. 2d at 541 (internal citations and quotation marks omitted). "Instead, it is for the Court to determine whether the agency has 'considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action.'" Id. (quoting J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000)).

Agency actions taken in the realm of national security and foreign affairs are entitled to heightened deference when subjected to judicial review under the APA. Open Soc'y Just. Initiative v. Trump, 510 F. Supp. 3d 198, 211 (S.D.N.Y. 2021) ("As a general rule, the 'evaluation of the facts by the Executive . . . is entitled to deference' when it comes to 'sensitive and weighty interests of national security and foreign affairs.'") (quoting Holder v. Humanitarian L. Project, 561 U.S. 1, 34 (2010)). Courts have "shown 'extreme' deference to [OFAC] blocking orders, which fall 'at the intersection of national security, foreign policy, and administrative law.'" Olenga v. Gacki, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) (quoting Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007) (noting that courts are "extremely deferential" in this area)); Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").

"Where, as here, a party seeks review of agency action under the APA and 'the entire case on review is a question of law,' summary judgment is generally appropriate." Noroozi, 905 F. Supp. 2d at 541 (quoting Citizens Against Casino Gambling v. Hogen, 2008 WL 2746566, at *25 (W.D.N.Y. July 8, 2008)).

## II.   ANALYSIS

### A.   Applicable Law

"The International Emergency Economic Powers Act [('IEEPA')], 50 U.S.C. §§ 1701-1706, empowers the President to impose economic sanctions to respond to unusual and extraordinary international threats to the United States." JPMorgan, 899 F.3d at 154.  In particular, the IEEPA allows the President to

> regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States. . . .

50 U.S.C. § 1702(a)(1)(B).

"Two weeks after the September 11 terrorist attacks, President Bush issued Executive Order 13224 . . . pursuant to his powers under the IEEPA. . . ." Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 445 (E.D.N.Y. 2008). "Executive Order 13,224[] declar[ed] a national emergency with respect to the 'grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States.'" United States v. Tajideen, 319 F. Supp. 3d 445, 453 (D.D.C. 2018), appeal dismissed, 2018 WL 7080502 (D.C. Cir. Dec. 31, 2018) (quoting Exec. Order. No. 13,224 (preamble)).  Executive Order "13,224 ordered the blocking of property of twenty-seven specific terrorists and terrorist organizations identified in an Annex." Kadi v. Geithner, 42 F. Supp. 3d 1, 6 (D.D.C. 2012).  The

10

Order also authorizes the Treasury Secretary "to designate additional persons whose property or interests in property should be blocked, where the Secretary finds that such persons 'act for or on behalf of' or are 'owned or controlled by' designated terrorists, or they 'assist in, sponsor, or provide . . . support for' . . . or are 'otherwise associated with' them." Id. (quoting Exec. Order. No. 13,224 § 1(c)-(d)). "The Secretary has delegated his authorities under the Executive Order to the Director of OFAC." Id. (citing 31 C.F.R. § 594.802). "Persons designated pursuant to the Executive Order are referred to as 'specially designated global terrorists' (SDGT)." Id. (citing 31 C.F.R. § 594.310). Such persons are included on OFAC's list of Specially Designated Nationals and Blocked Persons (the "SDN list"). See 31 C.F.R. § Ch. V, App. A (noting that the SDN list includes "specially designated global terrorists"); see also supra n.1.

Executive Order 13,224 authorizes the Treasury Secretary to "employ all powers granted to the President by IEEPA" to promulgate rules and regulations to carry out the Order's purposes. See Exec. Order No. 13,224 § 7; 31 C.F.R. Part 594 (the "Global Terrorism Sanctions Regulations"). As noted above, the IEEPA allows the Government to block "any property" to which a sanctioned party has "any interest." 50 U.S.C. § 1702(a)(1)(B). The "Global Terrorism Sanctions Regulations define 'property' and 'property interest' expansively to include, among other things, 'any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent.' . . . Similarly, the Regulations further define 'interest' when used with respect to property very broadly to mean 'an interest of any nature whatsoever, direct or indirect.'" JPMorgan, 899 F.3d at 157 n.4 (quoting 31 C.F.R. §§ 594.306, 594.309); see also Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 161 (D.C. Cir. 2003) (noting that the Treasury Department's broad definition of "any interest" has "been repeatedly upheld by the courts").

The IEEPA further provides that,

> [i]n any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera.

50 U.S.C. § 1702(c).

### B. Whether OFAC's Actions Were Arbitrary and Capricious

Rusaviainvest argues that OFAC's determination that the wire transfers should be blocked was arbitrary and capricious because the "limited portions of the administrative record available to Plaintiff[ do] not provide[] a reasonable justification for blocking the funds that Plaintiff tried to wire to Uzbekistan Airways." (Pltf. Br. & Opp. (Dkt. No. 61) at 14-15)

Pursuant to the IEEPA, this Court has conducted an in camera review of the classified information on which OFAC relied to block the transactions at issue, and to deny the licenses Plaintiff sought. Based on its review of this classified information, the Court finds that OFAC's decision to block the wire transfers at issue and to deny Plaintiff's license applications was not arbitrary and capricious. Indeed, based on the classified information reviewed by this Court, OFAC's decisions were based on ample evidence that the blocked funds transfers at issue involve an interest of a "person" sanctioned pursuant to Executive Order 13224.

Plaintiff argues, however, that neither Rusaviainvest, its owner, Vorobev, or its employees, nor Uzbekistan Airways, is on the SDN list. (Pltf. Br. & Opp. (Dkt. No. 61) at 14) However, "the plain text of the IEEPA authorizes the blocking of property in which the designated foreign national or country has 'any interest.'" Holy Land, 219 F. Supp. 2d 57, 67 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003) (quoting 50 U.S.C. § 1702(a)(1)(B)) (emphasis in Holy Land). The applicable regulations define "'interest' . . . very broadly to mean 'an interest of any nature whatsoever, direct or indirect.'" JPMorgan, 899 F.3d at 157 (quoting

12

31 C.F.R. § 594.306) (emphasis added). That no one on the sending or receiving end of the wire transfers "h[e]ld title to the blocked assets . . . does not preclude the blocking of such assets under the Global Terrorism Sanctions Regulations." Id.; see also OKKO Bus. PE v. Lew, 133 F. Supp. 3d 17, 25 (D.D.C. 2015) (noting that courts have "repeatedly held that the sweeping language of the IEEPA 'imposes no limit on the scope of interest' blockable under the IEEPA, and that an interest when used with respect to property means an interest of any nature whatsoever, direct or indirect" and that a "sanctions target need not have a legally enforceable ownership interest to justify a blocking under U.S. regulations") (internal quotation marks and citations omitted). The classified information demonstrates that an SDN had an "interest" in the funds, and OFAC was therefore permitted to block the wire transfers.

Plaintiff also argues that even if OFAC's initial blocking action was not arbitrary and capricious, its denial of Plaintiff's subsequent requests to unblock the funds was arbitrary and capricious. (Pltf. Br. & Opp. (Dkt. No. 61) at 11-12) But the classified information before the Court justifies both the initial blocking actions and the later refusal to unblock the funds.

Plaintiff further argues that OFAC's blocking decisions were arbitrary and capricious based on the sanctions programs' policy goals. (Id. at 11-14) This argument is not persuasive. As Defendants point out, the "un-blocking" of assets frozen by OFAC is not appropriate, because "'[m]aking exceptions for third parties . . . who attempt to cancel their transaction with a sanction[ed] entity'" would undermine the sanctions program's effectiveness and deterrent effect. (Def. Br. (Dkt. No. 58) at 22-23 (quoting OKKO Bus. PE v. Lew, 133 F. Supp. 3d 17, 28 (D.D.C. 2015)) Plaintiff argues that this policy rationale "does not apply" here, because Plaintiff did not know it was doing business with a sanctioned entity, and "no one can be deterred from doing something that it does not know is wrong in the first place." (Pltf. Br. &

13

Opp. (Dkt. No. 61) at 12-13) But the fundamental point here is that if an SDN has an interest in the funds, the transaction should be blocked. In any event, "matters of strategy and tactics relating to the conduct of foreign policy, [] 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury, 750 F. Supp. 2d 150, 157-58 (D.D.C. 2010) (quoting Regan v. Wald, 468 U.S. 222, 242 (1984)); see also id. ("[Plaintiff's argument] that OFAC's continued refusal to issue it a license fails to advance the policies and goals of the United States' sanctions program against Sudan . . . has no legal merit."); Holy Land, 219 F. Supp. 2d at 84 ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").[7]

This Court concludes that OFAC's actions in blocking the initial wire transfers and in denying Plaintiff's subsequent license applications were not arbitrary and capricious.

C. **Due Process**

Plaintiff argues that "OFAC's reliance on a record that is almost entirely classified is improper." (Pltf. Br. & Opp. (Dkt. No. 61) at 15-18 (capitalization altered)) Plaintiff initially bases its argument on its "fundamental right to due process" (id. at 16), before

---

[7] Plaintiff cites KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F. Supp. 2d 857, 916-17 (N.D. Ohio 2009) for the proposition that where OFAC fails to submit a satisfactory policy explanation for its actions, a court may conclude that the underlying action was arbitrary and capricious. (Pltf. Br. & Opp. (Dkt. No. 61) at 14) In KindHearts, the court concluded that OFAC's decision to disburse $27,000 in frozen funds as attorneys' fees – rather than the $46,000 requested by plaintiff's counsel – was not supported by OFAC's stated concern that full payment would "endanger the integrity of the balance of those assets or the government's ability permanently to retain [the $1 million res] when and if it became entitled to do so." KindHearts, 647 F. Supp. 2d at 916-17. The issues here are entirely different, and the KindHearts court's reasoning has no application here.

reframing the argument as one grounded in the APA (id. at 16 & n.5) and "fundamental fairness." (Pltf. Reply (Dkt. No. 62) at 4)

Defendants argue that any due process claim "should be dismissed" because it was not pleaded in the Complaint and, in any event, Plaintiff is a foreign entity without any U.S. ties, and thus has no right to due process. (Def. Opp. (Dkt. No. 59) at 3)

In its reply, Plaintiff states that it "has not brought a claim alleging that OFAC's underlying blocking of Plaintiff's funds or its denial of its license applications violates due process, nor is Plaintiff attempting to bring such a claim here." (Pltf. Reply (Dkt. No. 62) at 8) Instead, "Plaintiff's argument is that OFAC's attempt in this proceeding to justify its actions on a record that precludes Plaintiff from meaningfully reviewing and responding to OFAC's arguments is inequitable and procedurally improper." (Id.)

As discussed above, the administrative actions under review here are OFAC's blocking of the funds and denial of Plaintiff's subsequent license applications. The Court's role in this proceeding is to review the entirety of the record and determine whether OFAC's actions are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.'" Noroozi, 905 F. Supp. 2d at 541 (quoting 5 U.S.C. § 706(2)(A), (E)). As is also discussed above, the IEEPA explicitly authorizes OFAC's reliance on classified material in these proceedings. See 50 U.S.C. § 1702(c) ("In any judicial review of a determination made under this section, if the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera.")

Despite disclaiming the argument that "[OFAC's] denial of [Plaintiff's] license applications violate[d] [Plaintiff's right to] due process," (Pltf. Reply (Dkt. No. 62) at 8), Plaintiff asserts that the APA requires courts reviewing agency action to "set aside" decisions

15

that are (1) "'contrary to constitutional right'" and (2) "'[without] observance of [] procedure required by law.'" (Pltf. Br. & Opp. (Dkt. No. 61) at 16 & n.5 (quoting 5 U.S.C. § 706(2)(B), (D))) But Plaintiff's effort to filter its constitutional argument through the APA achieves nothing. See Olenga, 507 F. Supp. 3d 260 ("The Court has already rejected Plaintiff's constitutional due process claim and filtering that same argument through the APA does nothing to save it."); Fares v. Smith, 249 F. Supp. 3d 115, 129 (D.D.C. 2017), aff'd, 901 F.3d 315 (D.C. Cir. 2018) ("The Court . . . has concluded that OFAC comported with due process in its provision of post-designation notice to Plaintiffs, and moreover, Plaintiffs have not pointed to any regulation that required OFAC to provide more notice than what has already been provided in this matter.") To the extent that Plaintiff contends that OFAC has acted in a fashion that is "procedurally improper" (Pltf. Reply (Dkt. No. 62) at 8), Plaintiff has not identified any constitutional, legal, or regulatory provisions on which to base its procedural claims under the APA.

To the extent that Plaintiff contends that the ex parte use of classified information here is "inequitable" (Pltf. Reply (Dkt. No. 62) at 8), "under the separation of powers created by the United States Constitution, the Executive Branch has control and responsibility over access to classified information and has a 'compelling interest in withholding national security information from unauthorized persons in the course of executive business.'" People's Mojahedin Org. of Iran v. Dep't of State, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (quoting Dep't. of the Navy v. Egan, 484 U.S. 518, 527 (1988)).

D.     **Extraterritoriality**

Finally, Rusaviainvest argues that OFAC exceeded its statutory authority because the "presumption against extraterritoriality" should apply to the IEEPA and preclude OFAC from

16

blocking transactions between foreign entities that have no U.S. ties. (Pltf. Br. & Opp. (Dkt. No. 61) at 18-20; Pltf. Reply (Dkt. No. 49) at 13-14)  However, "the plain language of several provisions of the IEEPA unambiguously indicate that the IEEPA applies extraterritorially." Tajideen, 319 F. Supp. 3d at 457.  Indeed, the "purpose of the law is to protect national security – a fact made clear by the name of the act itself:  the International Emergency Economic Powers Act.  The text of the IEEPA similarly expresses Congress's intent to deal with international threats to the national security, foreign policy, and the economy of the United States." United States v. Akova, 2016 WL 7116127, at *6 (N.D. Ga. Oct. 28, 2016), report and recommendation adopted, 2016 WL 7118273 (N.D. Ga. Dec. 6, 2016) ("readily conclud[ing] that Congress intended for the IEEPA to apply extraterritorially") (emphases in original).  In sum, there is no merit to Plaintiff's argument that the IEEPA does not apply extraterritorially.

## CONCLUSION

For the reasons stated above, the Government's motion for summary judgment (Dkt. No. 57) is granted and Rusaviainvest's cross-motion for summary judgment (Dkt. No. 60) is denied.  The Clerk of Court is directed to terminate the motions and to close this case.

Dated: New York, New York
      September 21, 2023

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge